UNITED STATES of America,
Plaintiff–Appellee,

v.

Miguel MORALES–VASQUEZ a/k/a
Reymundo Gonzalez–Morales,
Defendant–Appellant.

No. 90–2405
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Nov. 29, 1990.

---

Lawrence A. Walsh, Walsh & Associates, Brownsville, Tex., for defendant-appellant.

James L. Turner, Paula C. Offenhauser, Asst. U.S. Attys., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before KING, GARWOOD, and DUHÉ, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Miguel Morales–Vasquez (Morales–Vasquez)[1] was convicted based on his guilty plea of intentionally failing to report an export of currency in excess of $10,000, in violation of 31 U.S.C. § 5316. At sentencing, applying section 2S1.3(a)(1)(A) of the United States Sentencing Guidelines (USSG), the district court found Morales–Vasquez to have engaged in structuring transactions to evade the reporting requirement, and accordingly sentenced him to twenty-four months' imprisonment. Morales–Vasquez appeals, complaining only of his sentence. He challenges the district court's findings and application of USSG § 2S1.3(a)(1)(A), and argues that he should have been sentenced to a lesser term under USSG § 2S1.3(a)(2). We reject Morales–Vasquez's arguments, and accordingly affirm.

---

1. At the time of his arrest on December 18, 1989, Morales–Vasquez used the alias "Reymundo Gonzalez–Morales." Morales–Vasquez's true identity was not discovered until January 24, 1990. The judgment entered on April 30, 1990 reflected Morales–Vasquez's true name as well as his alias.

## The BVD Bailees

On December 18, 1989, Benito Sanchez (Sanchez) drove a Nissan truck into the southbound lanes of the Progreso, Texas, Port of Entry at the United States–Mexican border. Customs Inspectors Garcia and Saenz noted several sacks and suitcases in the vehicle, as well as its crowded condition with five occupants, and decided to refer it to the secondary inspection station. At the secondary inspection, the agents asked Sanchez and the front-seat passenger (Morales–Vasquez, who identified himself as "Gonzalez–Morales") whether they were transporting any weapons, ammunition, or currency/negotiable instruments valued in excess of $10,000. Sanchez and Morales–Vasquez advised the agents that they were fully aware of the arms and currency reporting requirements, but denied that they carried anything that they were required to report. Unsatisfied with this response, one of the inspectors searched an unusually bulky jacket carried by one of the passengers, finding a large quantity of .45 caliber ammunition. Following this discovery, the inspectors initiated a frisk search of all five passengers. Four others were found to possess ammunition; consequently, all five men were taken to the United States Customs processing room and searched more thoroughly.

During the personal search of the five detainees, the agents recovered over $20,-000 in United States currency. Morales–Vasquez himself was found to be carrying $5,633 in cash; additionally, three other passengers were found to have secreted $5,000 each in their underwear. In response to the inspectors' inquiries, Morales–Vasquez admitted that all of the cash was his, and that he had intentionally divided the $20,000 among his companions—the "BVD bailees"—to avoid filing a Currency and Monetary Instruments Report Form (CMIR). He further stated that he had instructed them to hide the cash in their underwear to avoid detection by the customs agents.

On January 9, 1990, Morales–Vasquez was charged with intentionally attempting to transport United States currency in excess of $10,000 from the United States into Mexico without filing the required CMIR.[2] On January 18, still using the alias "Reymundo Gonzalez–Morales," Morales–Vasquez entered a plea of guilty. Applying the USSG, the district court found that Morales–Vasquez had structured transactions with his companions to evade the export reporting requirement, which made his base offense level thirteen under section 2S1.3(a)(1)(A). Morales–Vasquez was given a two-point reduction for acceptance of responsibility, USSG § 3E1.1; however, based on his admission of using an alias to hide his criminal history, his offense level was increased by two points for obstruction of justice, USSG § 3C1.1.[3] The district court found the adjusted offense level to be thirteen, and determined that Morales–Vasquez's criminal history placed him in category III. Accordingly, the district court sentenced Morales–Vasquez to twenty-four months' imprisonment—the maximum guideline sentence indicated by the USSG. In addition, the district court imposed three years of supervised release and a special assessment of $50.

On appeal, Morales–Vasquez challenges the district court's findings and application of USSG § 2S1.3(a)(1)(A) on three grounds. First, Morales–Vasquez argues that section 2S1.3(a)(1)(A) requires structuring of more

---

**2.** The indictment stated that Morales–Vasquez was

"knowingly about to transport, at one time, monetary instruments, namely United States currency, in excess of $10,000.00 from a place in the United States to a place outside the United States, without filing the Currency and Monetary Instruments Report, Form CF–4790, required to be filed by the provisions of Title 31, United States Code, Section 5316(b), well knowing the requirement of filing such a report."

**3.** We do not address the propriety of combining an obstruction of justice enhancement and an acceptance of responsibility reduction, as that is not before us and no party complains of it. *See* application note four to section 3E1.1 as amended effective November 1, 1989 ("There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply"); *United States v. Rivera*, 879 F.2d 1247, 1254 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 554, 107 L.Ed.2d 550 (1989) (1988 sentence).

than one transaction, and that he was engaged in only one transaction—one attempt to export cash in excess of $10,000. Second, he claims that he did not structure transactions to evade reporting requirements, but merely concealed the cash to avoid detection. Finally, Morales–Vasquez asserts that section 2S1.3(a)(1)(A) applies only to structuring transactions with financial institutions. Based on each of these alternative arguments, Morales–Vasquez asserts that the district court erroneously applied section 2S1.3(a)(1)(A), with a base offense level of thirteen, instead of alternative section 2S1.3(a)(2), which has a base offense level of only five.

## Discussion

### I.

*Background: Smurfing*

As part of a comprehensive scheme to curtail money laundering and income tax evasion, Congress enacted the Currency and Foreign Transactions Reporting Act (CFTRA) in 1970. 31 U.S.C. § 5311 *et seq.* (as revised).[4] Under section 5313 of that Act, and the regulations promulgated thereunder, financial institutions are required to report currency transactions exceeding $10,000. *See* 31 U.S.C. § 5313(a); 31 C.F.R. § 103.22(a)(1) (1990). Similarly, individuals importing or exporting more than $10,000 in United States currency are required to file a report with the government. 31 U.S.C. § 5316; 31 C.F.R. § 103.23 (1990). Because individuals engaging in sizable cash transactions often are involved in illegal activity, reports filed pursuant to these requirements assist the government in its efforts to combat a wide range of criminal conduct. *United States*

*v. Scanio,* 900 F.2d 485, 487 (2d Cir.1990). However, the government's attempts to collect this information have sometimes been frustrated by persons who "structure" their currency transactions; *i.e.,* break up large quantities of cash into smaller quantities each below the reporting threshold to avoid triggering the filing obligations. *See id.*

The impact of structuring has been most pronounced in the financial institution context. The army of persons who scurry from bank to bank to accomplish these multiple transactions have become known as "smurfs," a reference to the cartoon characters of the same name. Welling, *Smurfs, Money Laundering, and the Federal Criminal Law: The Crime of Structuring Transactions,* 41 Fla.L.Rev. 287, 288 (1989). Faced with the structuring problem, some courts construed 18 U.S.C. § 1001[5] as prohibiting schemes designed to cause banks to fail to file transaction reports required under 31 U.S.C. § 5313. *See, e.g., United States v. Tobon–Builes,* 706 F.2d 1092, 1098 (11th Cir.), *reh'g denied,* 716 F.2d 914 (11th Cir.1983). Other courts, however, refused to find liability on the part of bank customers, who have no duty to report financial transactions under 31 U.S.C. § 5313. *See, e.g., United States v. Anzalone,* 766 F.2d 676, 683 (1st Cir. 1985). Finally, Congress sought to enhance the arsenal of prosecutors in their battle against drug traffickers and money launderers by enacting an "anti-smurfing" statute as part of the Comprehensive Anti–Drug Abuse Act of 1986, Public Law 99–570, 100 Stat. 3207 (October 27, 1986). *See United States v. Scanio,* 900 F.2d 485, 488 (2d Cir.1990); Welling, 41 Fla.L.Rev. at 289. The new provision, 31 U.S.C. § 5324,[6] substantially resolved the referenced de-

---

**4.** The original Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act, was codified at 31 U.S.C. § 1051 *et seq.*

**5.** 18 U.S.C. § 1001 provides:
"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing

or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

**6.** 31 U.S.C. § 5324 states:
"No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—
"(1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a);

bate among the circuits by "expressly subjecting to potential liability a person who causes or attempts to cause a financial institution to fail to file a required report or who causes a financial institution to file a required report that contains material omissions or misstatements of fact." *United States v. Scanio*, 705 F.Supp. 768, 773 (W.D.N.Y.1988) (citing H.R.Rep. No. 99–746, 99th Cong., 2d Sess. at 18–19 (August 5, 1986)). By taking this action, Congress in large measure codified *Tobon-Builes* and like cases and negated the effect of *Anzalone* and similar cases. *See id.* at 770 (citing S.Rep. No. 99–483, 99th Cong., 2d Sess. at 21–22 (1986)).

The provision of the CFTRA under which Morales–Vasquez was convicted requires individuals to report to the government the import or export of currency in excess of $10,000. 31 U.S.C. § 5316.[7] Unlike section 5313, which places the reporting burden on the financial institutions, subsection 5316(a) places the burden squarely on any person, or agent or bailee of that person, who transports more than $10,000 in monetary instruments into or out of the United States "at one time." Recognizing that the "smurfing" loophole existed in this context as well as in dealings with financial institutions, Congress also amended section 5316 in the Anti–Drug Abuse Act of 1986, adding subsection (d), which gave the Secretary of the Treasury the authority to prescribe regulations defining the subsection 5316(a) term "at one time." Subsection 5316(d) also provides that the "regulations may permit the cumulation of closely related events" so that they "may collectively be considered to occur at one time for purposes of subsection (a)." The House Report noted:

> "This provision closes a loophole regarding reports of transporting cash out of the country.... This amendment permits the Secretary to prescribe regulations to define the term 'at one time' to permit the cumulation of closely related events in order that they may collectively be considered to occur at one time for purposes of the reporting requirements." H.R.Rep. 99–855, Part I, 99th Cong., 2d Sess.1986 (cited in 54 Fed.Reg. 28,416 (1989)).

As a result of this statutory authorization, the Treasury, effective August 7, 1989, created a definition of "at one time" for inclusion in the CFTRA regulations, intending "to make clear that structuring schemes involving the international transportation and receipt of monetary instruments are illegal to the same extent that structuring schemes to evade the domestic currency transactions reporting requirements ... are illegal."[8] *See* 54 Fed.Reg. 28,416–17 (July 6, 1989).

Persons convicted of reporting offenses under the CFTRA are sentenced under

---

> "(2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) that contains a material omission or misstatement of fact; or
> "(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions."

7. Subsection 5316(a) provides:
> "Except as provided in subsection (c) of this section, a person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—
> "(1) transports or has transported monetary instruments of more than $10,000 at one time—
> "(A) from a place in the United States to or through a place outside the United States; or
> "(B) to a place in the United States from or through a place outside the United States; or
> "(2) receives monetary instruments of more than $10,000 at one time transported into the

United States from or through a place outside the United States." 31 U.S.C. § 5316(a).
Section 5322 sets out the criminal penalties for violations of the money laundering statutes, and provides in pertinent part that "[a] person willfully violating this subchapter or a regulation prescribed under this subchapter ... shall be fined not more than $250,000, or imprison[ed for] not more than five years, or both." 31 U.S.C. § 5322(a).

8. The definition of "at one time" now reads:
> "For purposes of § 103.23 of this part, a person who transports, mails, ships or receives; is about to or attempts to transport, mail or ship; or causes the transportation, mailing, shipment or receipt of monetary instruments, is deemed to do so 'at one time' if:
> "(1) That person either alone, in conjunction with or on behalf of others;
> "(2) Transports, mails, ships or receives in any manner; is about to transport, mail or ship in any manner; or causes the transporta-

USSG § 2S1.3, which provides that the base offense level will be thirteen if the defendant:

"[ (a)(1) ](A) structured transactions to evade reporting requirements; or

"(B) made false statements to conceal or disguise the evasion of reporting requirements; or

"(C) reasonably should have believed that the funds were criminally derived property...." USSG § 2S1.3(a)(1) (1989).

If none of the provisions under section 2S1.3(a)(1) apply, the base offense level is only five. USSG § 2S1.3(a)(2).[9]

In a case of first impression, this Court is now called upon to interpret USSG § 2S1.3 and determine whether Morales–Vasquez's act of dividing $20,000 among his companions to circumvent the reporting requirement of 31 U.S.C. § 5316 qualifies as a structuring offense and thus merits a base offense level of thirteen pursuant to section 2S1.3(a)(1)(A).[10] Morales–Vasquez

tion, mailing, shipment or receipt in any manner of;

"(3) Monetary instruments;

"(4) Into the United States or out of the United States;

"(5) Totaling more than $10,000;

"(6)(i) On one calendar day or (ii) if for the purpose of evading the reporting requirements of § 103.23 on one or more days." 31 C.F.R. § 103.11(a) (1990).

**9.** The background notes indicate that cases with a base offense level of five will be those that "involve simple recordkeeping or other more minor technical violations of the regulatory scheme governing certain monetary transactions committed by defendants who reasonably believe that the funds at issue emanated from legitimate sources."

**10.** The district court, stating that "the 'exculpatory no' doctrine"—see Paternostro v. United States, 311 F.2d 298 (5th Cir.1962); United States v. Schnaiderman, 568 F.2d 1208, 1212 (5th Cir.1978)—"might or might not apply," expressly declined to find that Morales–Vasquez's negative response to the custom agents' inquiries sufficed to invoke USSG § 2S1.3(a)(1)(B), dealing with false statements, and for guideline purposes relied entirely on section 2S1.3(a)(1)(A), dealing with structuring. Although the government refers to section 2S1.-3(a)(1)(B), it does not complain of the district court's refusal to invoke section 2S1.3(a)(1)(B), nor does it clearly seek to uphold the sentence

presents three arguments against application of that guideline provision, each of which will be discussed in turn below.

## II.

### A. Standard of Review

We review application of the USSG fully for errors of law. *United States v. Otero*, 868 F.2d 1412, 1414 (5th Cir.1989). On the other hand, findings of fact are entitled to considerable deference under the clearly erroneous standard of review. *United States v. Barbontin*, 907 F.2d 1494, 1497 (5th Cir.1990). Sentences imposed as a result of incorrect application of the guidelines must be reversed. *United States v. Mejia–Orosco*, 868 F.2d 807 (5th Cir.), *clarified*, 868 F.2d 807 (5th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989). We find no such misapplication here.

### B. The Transaction Requirement

Morales–Vasquez first presents the argument that the mere act of dividing

on the basis of that guideline provision; and it does not brief or argue the "exculpatory no" issue. Consequently, we do not address section 2S1.3(a)(1)(B), and we rest our affirmance on section 2S1.3(a)(1)(A).

The district court did remark at sentencing that if the proper base offense level were five instead of thirteen the court would still have imposed a twenty-four-month sentence because Morales–Vasquez's criminal history category did not adequately reflect "the type of sentence this individual should have imposed on him." The government suggests that we may affirm the sentence on this basis. Morales–Vasquez's criminal history category was III, and the district court observed that it did not take into account pending firearm and bond violation charges or a more than ten-year-old manslaughter conviction involving a knife. However, even with a criminal history category of VI, the USSG maximum guideline range for a base offense level of five would be fifteen months. The district court gave no indication that it considered the guideline sentences for any of criminal history categories IV, V, or VI. It may be doubtful that the district court's general, conclusory statements in this respect constitute adequate findings to support such a departure on this basis. *See* USSG § 4A1.3; *United States v. Lopez*, 871 F.2d 513 (5th Cir.1989); *United States v. Rios*, 876 F.2d 24 (5th Cir.1989). Accordingly, we do not rest our affirmance on this theory, but rather on section 2S1.3(a)(1)(A).

monetary instruments in excess of $10,000 among several individuals does not constitute a structuring offense triggering the higher offense level under USSG § 2S1.3(a)(1)(A) because the act merely constitutes a single transaction. This argument is based on the premise that the concept of "structured transactions" necessarily contemplates a series of multiple subtransactions occurring at different times or places.

Section 5316 places the reporting burden on the individual who wishes to import or export more than $10,000,[11] and a violation may occur in at least two ways: a single unreported import or export of more than $10,000 is a violation; further, if the individual, intending to evade the reporting requirement, divides the money into amounts each less than $10,000 and places the bundles with bailees, he has committed an offense regardless of whether the bailees cross the border in a common vehicle or in a caravan. The Treasury regulations make this clear by defining "at one time" under 31 U.S.C. § 5316 to include a single transport, or multiple transports if they are conducted in an attempt to evade the reporting requirement. *See* 31 C.F.R. 103.11(a) (1990). We conclude that a single border crossing involving two or more individuals in one vehicle, each possessing cash below the reporting threshold in a scheme to evade the reporting requirement by dividing between them a single reportable sum previously possessed and reportable by one of them, may constitute a structured transaction meriting the higher offense level under USSG § 2S1.3(a)(1)(A).[12]

The preceding analysis is supported by our decision in *United States v. Thompson*, 603 F.2d 1200 (5th Cir.1979), which was the first case squarely to present the structur-

ing issue in the financial institution context. In *Thompson*, a bank executive made a $45,000 loan to a cocaine dealer, which he structured as a series of five loans of $9,000 each. *Id.* at 1202. All loan documents were signed simultaneously, and the entire $45,000 in cash was handed to the customer in a lump sum. *Id.* at 1203. We aggregated the loans and held that the transaction—the transfer of $45,000 from the bank to the customer—was for an amount in excess of $10,000, but had been impermissibly "structured" to evade the reporting requirement. *Id.* at 1202–03. Accordingly, the bank executive's conviction pursuant to 31 U.S.C. § 1059 (now 31 U.S.C. § 5322(b)) for failing to report a financial transaction in excess of $10,000 was affirmed. *Id.* at 1204. *Thompson* is closely analogous to the situation currently before us in that the individual with the duty to report divided the currency into lesser amounts in an attempt to evade the reporting requirement. Further, in *Thompson*, although the cash was transferred at one time in one lump sum, it was structured into several amounts each below the reporting threshold. We therefore conclude that the concept of "structured transactions" under USSG § 2S1.3(a)(1)(A) does not necessarily contemplate multiple transactions separated in time or place.

Here, each transfer of $5,000 by Morales–Vasquez to his three companions—the BVD bailees—was a "physical transfer of currency from one person to another," and thus a "transaction" within the regulations. 31 C.F.R. § 103.11(r) (1990). These transactions each involved the breaking down of a reportable sum into an amount less than the threshold amount of the reporting requirement—*i.e.*, they were "structured."[13] Each bailee was to be the

---

**11.** In contrast, section 5313 places the reporting obligation on the financial institution itself, rather than on the individual dealing with it; and a section 5324 violation may occur when the individual dealing with the institution attempts to structure the transaction so as to circumvent the institution's obligation to report.

**12.** We also observe that the Commission's background notes to this guideline state that "[a] base offense level of 13 is provided for those

offenses where the defendant ... structured the transaction to evade reporting requirements." The use of the singular "transaction" indicates that the Commission contemplated situations in which the defendant could commit an offense with a single structured transaction.

**13.** The term "structure," as it relates to an individual's conduct of a currency transaction, has been said to refer to the manner in which the transaction is effected. *United States v. Scanio,*

transporter into Mexico of the cash transferred to him by Morales–Vasquez, and Morales–Vasquez was to be the transporter of the remainder. Morales–Vasquez admitted that the purpose of the division was to avoid having to report the export of the cash. Thus, the transactions were structured with the admitted purpose of evading the reporting requirements. This is so notwithstanding that the individuals intended to ride together into Mexico in the same vehicle.

We conclude that Morales–Vasquez's first argument fails.

### C. *The Structuring Requirement*

■ Morales–Vasquez's second argument actually consists of two subarguments. First, he claims that in dividing the currency among his companions and instructing them to hide the cash in their underwear, he did not "structure" transactions, but instead merely concealed the cash. In other words, Morales–Vasquez claims that the only purpose behind dividing the money was to make it easier to hide, not to create amounts below the reporting threshold. This argument cannot stand, however, in light of the district court's finding that Morales–Vasquez divided the cash to evade the reporting requirement.[14] That finding, which is supported by Morales–Vasquez's admission to the customs agents and is not clearly erroneous, supports the district court's application of USSG § 2S1.3(a)(1)(A).

■ Second, Morales–Vasquez continues this factual argument by claiming that he divided the cash to *avoid*, not to *evade*, the reporting requirement, and section 2S1.-

3(a)(1)(A) punishes only evasion. Using a "sensible, substance-over-form approach,"[15] we rejected that distinction in *Thompson*, 603 F.2d at 1203–04. In *Thompson*, the defendant argued that he was entitled to structure a single transaction to avoid the obligation to report just as a taxpayer is entitled to structure financial transactions in a certain manner to avoid, rather than evade, the payment of taxes. We found the analogy to be inapposite, concluding that the purpose of the transaction reporting requirements is to supply the government with a source of information about potential illegal activity; these reporting requirements themselves may not therefore be purposefully avoided or evaded through clever structuring.

### D. *Scope of USSG § 2S1.3(a)(1)(A)*

■ Finally, Morales–Vasquez claims that because his acts did not involve a financial institution, his conduct does not constitute a structuring offense within the USSG. As support for his argument, Morales–Vasquez relies on the title of USSG § 2S1.3, which is "Failure to Report Monetary Transactions; Structuring Transactions to Evade Reporting Requirements." The only statutory violation punishable by this guideline that expressly deals with a structuring activity, Morales–Vasquez continues, is 31 U.S.C. § 5324, which is entitled "Structuring transactions to evade reporting requirements prohibited." Placing great emphasis on the two-part character of the title, Morales–Vasquez concludes that the Sentencing Commission manifested an intent that the structuring activity covered by the USSG is that specifically

---

705 F.Supp. 768, 776 (W.D.N.Y.1988), *aff'd,* 900 F.2d 485 (2d Cir.1990). The *Scanio* court noted, "The use of the word 'structure' adds no mystifying element to the crime; indeed the choice of the term structure reveals an intent to focus on the 'organized' nature of the currency transaction thus providing a slightly more limiting interpretation of the crime than the use of the word transact might permit." *Id.*

14. During the sentencing hearing, the district court stated:
"[Morales–Vasquez] had four different individuals structure a particular transaction which became transactions. He gave three

other individuals $5,000 apiece to structure this transaction, and he himself said that he was structuring it, that the reason that he gave the $5,000 to each one of them was so that it would be structured so that the reporting requirements in his mind would be evaded."

15. This approach has been followed by several other courts. *See, e.g., United States v. Cook,* 745 F.2d 1311, 1315 (10th Cir.1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985); *United States v. Tobon–Builes,* 706 F.2d 1092, 1098 (11th Cir.), *reh'g denied,* 716 F.2d 914 (11th Cir.1983).

referred to by statute under 31 U.S.C. § 5324, which involves structuring transactions with financial institutions.

We find Morales–Vasquez's argument to be without merit. First, Morales–Vasquez is incorrect that section 5324 is the only statute within this guideline that deals with structuring; the recent amendments to the Treasury Regulations make clear that the reporting requirements of section 5316 can be violated by structuring. *See* 31 C.F.R. § 103.11(a) (1990). Furthermore, had the Commission intended USSG § 2S1.3(a)(1)(A) to apply only to violations of 31 U.S.C. § 5324, it could easily have made that intent explicit. It is illogical to assume that the Sentencing Commission would place section 5324 within the scope of a rather lengthy guideline if all violations of that statute would necessarily fall within a specific subsection of the guideline, and no other statutory violation within the scope of the guideline could ever fall within that subsection. The more logical approach, if Morales–Vasquez's premise were correct, would have been to have a separate guideline provision for violations of section 5324.

Because the USSG are subject to the rules of statutory construction, we follow the clear, unambiguous language of the USSG if there is no discernible manifestation of contrary intent. *United States v. Vickers*, 891 F.2d 86, 88 (5th Cir.1989). We therefore reject Morales–Vasquez's theory and follow the clear language of USSG § 2S1.3(a)(1)(A), which makes no reference to dealings with financial institutions. In creating this guideline, the Commission must have intended to differentiate between an individual's simply failing to make a required transaction report, for which the base offense level would be five, and the more culpable conduct of trying to falsely draw an innocent picture; *i.e.*, of purposefully structuring a known reportable transaction into several facially unreportable transactions, which logically merits the higher offense level of thirteen regardless of the context in which the offense occurred. We conclude, therefore, that if an individual engages in structuring transactions to evade the reporting require-

ment under 31 U.S.C. § 5316, that individual properly may be sentenced under USSG § 2S1.3(a)(1)(A).

### Conclusion

Having found all of Morales–Vasquez's arguments against application of USSG § 2S1.3(a)(1)(A) to be without merit, we accordingly affirm his conviction and sentence.

AFFIRMED.