UNITED STATES of America, Plaintiff–Appellee,

v.

**Gbemi Ramata HASSAN, also known as Shade Adetola, Defendant–Appellant.**

No. 89–2559.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1990.

Decided March 6, 1991.

Sergio E. Acosta, Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Steven O. Ross, Chicago, Ill., for defendant-appellant.

Gbemi R. Hassan, Chicago, Ill., pro se.

Before WOOD, Jr., COFFEY and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant Gbemi Ramata Hassan, also known as Shade Adetola, pleaded guilty to count two of an indictment that charged her with knowingly and willfully failing to report attempted transportation of more than $10,000 in United States currency, in violation of Title 31, United States Code, sections 5316(a) and 5322(a). The district court sentenced Hassan to thirty-three months imprisonment and three years supervised release, imposed a fine of $13,112 and a special assessment of $50. This sentence was based on the adjusted offense level of twenty with a criminal history category of I, as calculated under the United States Sentencing Guidelines ("Guidelines"). Hassan now challenges the district court's sentencing determination on the grounds that the district court drew unreasonable inferences from the record and the presentence report, thus violating her fifth amendment due process rights. We affirm.

## I. BACKGROUND

On December 29, 1988, Gbemi Hassan went to Chicago's O'Hare International Airport where she planned to board a KLM flight to the Netherlands, final destination Nigeria. That same day United States Customs Service agents were conducting an outbound currency operation at the terminal at which the passengers for the KLM flight were boarding. An outbound currency operation is a means of securing compliance with federal currency reporting requirements.[1] Loud speaker announcements reported the required disclosure of currency, as did posted signs that advised passengers of the requirements. In addition, the agents interviewed some individual passengers and inquired as to how much United States currency they were carrying.

Agents stopped Hassan as she attempted to board. When questioned about the amount of currency she was carrying in her purse, she told the agents she had $8,000. A search of one of her bags revealed that she in fact had $9,000. As the agents questioned Hassan further, they learned that she did not have a passport. She initially told the agents that her name was Shade Adetola, the name also on her airline ticket. After the agents discovered a temporary resident alien card (green card) for Gbemi Hassan and a photograph on that card that strongly resembled the defendant, she admitted that her name was Gbemi Hassan. Shortly before a female agent searched Hassan's person, Hassan revealed that she had an additional $4,000 United States currency hidden in her undergarments.

After collecting all of Hassan's money, the agents placed it in a box and subjected it to narcotics detection by a trained dog. In a room full of similar boxes, the dog was strongly attracted to the box containing Hassan's currency, indicating the presence of narcotics on the money.

Hassan was arrested and charged with knowingly and willfully making false, fictitious and fraudulent statements or representations to the United States Customs Service, in violation of 18 U.S.C. § 1001. Following a detention hearing before a magistrate, the magistrate found a serious risk that Hassan might flee and ordered that she be detained. The magistrate based the decision on the multiple aliases and social security numbers used by Hassan, the false answers given to government agents at her arrest, and the magistrate's finding that the testimony given by Hassan at the hearing was difficult to believe and implausible.

The grand jury indicted Hassan on two counts. Hassan pleaded guilty to the second count—knowingly and willfully failing to report attempted transportation of United States currency of more than $10,000, in violation of 31 U.S.C. §§ 5316(a), 5322(a). The presentence investigation report recommended a sentencing level of thirteen—the base offense level as agreed upon by the parties in the plea agreement. U.S.S.G. § 2S1.3(a)(1). The government requested an increase of five levels, as provided in the Guidelines for the situation in which a defendant knew or believed that the funds were criminally derived. U.S.S.G. § 2S1.3(b)(1).

The district court judge imposed a sentence of thirty-three months imprisonment, three years supervised release, a fine of $13,162 and a special assessment of $50, after determining the offense level to be twenty. Starting with the base offense level of thirteen, the court then added the requested five levels pursuant to Guidelines section 2S1.3(b)(1) because it determined that Hassan knew or believed the funds she was carrying were criminally derived. The district court increased the sentence an additional two levels pursuant to Guidelines section 3C1.1, based on its conclusion that Hassan obstructed justice

---

1. The relevant currency regulation provides:

   (a) [A] person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—

   (1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—

   (A) from a place in the United States to or through a place outside the United States. . . .
   31 U.S.C. § 5316.

by testifying untruthfully at the detention and sentencing hearings.

## II. ANALYSIS

■ Hassan asserts that the district court did not give proper consideration to the facts of the case in making its sentencing determination, and therefore violated her fifth amendment due process rights. We note that the "due process clause requires courts to use procedures adequate to reach informed and accurate decisions in the main; it does not guarantee that all decisions will be correct or persuasive to the accused." *United States v. Escobar-Mejia*, 915 F.2d 1152, 1154 (7th Cir.1990) (citations omitted). In reviewing a district court's sentencing determination, this court "shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). *See United States v. Gant*, 902 F.2d 570, 571 (7th Cir.1990); *United States v. Vopravil*, 891 F.2d 155, 157 (7th Cir. 1989).

### A. Criminally Derived Property

■ Guidelines section 2S1.3(b)(1) states, "[i]f the defendant knew or believed that the funds were criminally derived, increase by 5 levels." U.S.S.G. § 2S1.3(b)(1).[2] In its objection to the presentence report filed by Hassan's probation officer, the government presented its reasons for requesting the section 2S1.3(b)(1) increase in Hassan's offense level. The government contended that the money Hassan attempted to transport was derived from illegal drug trafficking. The government listed the evidence that it viewed as indicative of Hassan's knowledge or belief that the currency she failed to declare was criminally derived.

The government's presentence objection included eight major reasons for the requested increase. First, a narcotics dog reacted positively to the money taken from Hassan upon her arrest. Second, Hassan's bank account records showed a series of large deposits and large withdrawals in 1988.[3] Hassan also made a deposit of $1,500 on December 19, 1988, after an earlier trip to Nigeria, and a withdrawal of $1,400 on December 28, 1988, the day before her attempted return. Third, in July 1988, Hassan exchanged $7,000 in United States currency, all in less than one hundred dollar denominations, for $7,000 in larger denominations of United States currency. Fourth, during the period in which Hassan deposited over $12,000 to her bank account, she earned a total of $3,600 to $4,100 from her job at a nursing home. Fifth, Hassan had been unemployed for the three months prior to her arrest. During that time she had twice purchased tickets to Nigeria, paying $1,150 in cash for the second trip alone. She also was renting an apartment for $74 per month. Sixth, Hassan maintained a relationship with Abbey Ogundipe, a man whose wife maintained that he was a heroin dealer and whose seemingly drug-related murder bolstered that assertion. Hassan lived in his house for a short time. Seventh, following her arrest, customs officials intercepted a package sent to Hassan which contained a Nigerian passport in her name, bearing her signature and picture. Eighth, when arrested, Hassan had concealed $4,000 in her undergarments,[4] and she lied to the customs officials about the amount of money she was carrying. In addition, at her detention hearing she lied about the source of the money, her bank accounts, and the $7,000 currency exchange.

Hassan asserts that "extenuating circumstances" explain the conduct that she feels the government mischaracterized, and she claims that she revealed the reasons for her behavior in her testimony at both

---

2. This section, as amended November 1, 1989, includes the word "property" after "criminally derived."

3. The district court reviewed Hassan's banking records at the sentencing hearing.

4. One of the customs agents who questioned Hassan, Agent Koszola, testified at the detention hearing that currency smugglers often conceal currency in this manner.

the detention and sentencing hearings. Because of the importance of these claimed "extenuating circumstances" to the sentencing determination, we include some of the highlights.

Hassan testified that she came to the United States in 1978. She entered the country illegally and initially used the name Gbemi Ogbara. She stopped using that name and began using her real name, Gbemi Hassan, when she applied for amnesty in 1988. At the detention hearing, Agent Koszola stated that when he questioned Hassan on December 29, 1988, she said that she had not left the United States for twelve years. Koszola later revealed that Hassan's Nigerian passport, found in the package intercepted by customs officials, showed that earlier in December 1988, Hassan traveled to Nigeria. Upon her return to the United States from that trip, she filled out a currency disclosure form.

In her testimony at the detention hearing, Hassan denied having told the agent that she had not left the country for twelve years. She explained that she made the earlier December journey to Nigeria to visit her ailing mother. She had her passport for that trip, but between her return from that trip and her arrest, she lost her passport. Hassan explained that her mother died December 23, 1988, and that she had to return to Nigeria quickly. Her religion required that she, as eldest child, be present for the funeral, which had to occur within eight days of the death. She realized that she did not have her passport, but because of the need for her immediate return, she did not have time to secure a replacement passport. She therefore attempted to board the KLM flight to Nigeria using her sister's passport. When the customs officials asked Hassan her name, she told them her sister's name because it was the name on her airline ticket and the

passport she did not show to the officials. Hassan apparently was afraid to tell the truth because of her tenuous status as an illegal alien.

Hassan stated that she did not hear the disclosure requirement announcements on the day of her arrest; however, Agent Koszola countered that on that day when he asked her whether she had heard the announcement, she replied affirmatively. She acknowledged that she told the agent she was carrying only $8,000. She attributed that reply to the agent's question of how much money she had in her purse, not how much she had in her possession. She said she was carrying the large amount of United States currency, money she had earned and saved, in order to pay for her mother's funeral.[5] She carried cash because she was uncertain as to whether a Nigerian funeral home or bank would accept anything but cash.

At the sentencing hearing, the district court gave both sides a full opportunity to argue the sentencing issue. Hassan raised specific objections to the government's assertions in its sentencing recommendation. Those objections included the following: the government's characterization of Hassan's use of aliases; the suggestion that Hassan lied at the detention hearing; the government's representation of Hassan's situation regarding her mother's death; the allegations of Hassan's association with Ogundipe and other drug dealers who may have lived in Hassan's apartment building; the contention that Hassan communicated well in English; and the indication that Hassan's employment history did not correspond to the amount of money in her possession at the time of her arrest. The district court took account of these objections. The court decided not to consider, for sentencing purposes, the government's assertion that drug dealers lived in Hassan's apartment building.[6] The court ac-

---

5. Hassan stated that she accumulated the $13,000 over a period of five years. She had worked at a nursing home, before being fired, for a salary of five dollars per hour, and worked approximately sixteen hours a day. She added that she supplemented her income by working as a private duty nurse.

6. At the conclusion of the sentencing hearing, the district court judge said that Hassan's involvement with Ogundipe, when considered with the rest of the evidence, was one of the many factors suggesting that Hassan knew the funds were criminally derived. Hassan asserts the district court should have disregarded the

cepted the fact that Hassan's mother died in December 1988, and Hassan provided documentation to that effect. Also, the court agreed to consider Hassan's claim that her use of aliases was attributable to her fear of being discovered as an illegal alien, and that the aliases were irrelevant to her sentencing.[7]

Hassan offered at the hearings, and continues to offer on appeal, other explanations for her suspect behavior. She contends that she had problems communicating with the agents and the courts because of her difficulty with the English language. The district court did not accept this language argument, but instead found that she speaks and understands English. She attributed the large withdrawals from her bank accounts to the situation with her mother's illness. She said that she had to make several withdrawals because the bank restricted the amount she could withdraw at one time. At the detention hearing, Hassan did not recall any $7,000 currency exchange. At the sentencing hearing, however, Hassan claimed to have exchanged $7,000 in smaller bills for larger bills as a favor for a cousin, a Nigerian businessman.

Using the preponderance of the evidence standard, as is proper according to the Guidelines, the district court concluded that the preponderance of the evidence indicated that Hassan knew that the money in her possession was criminally derived. *See United States v. White*, 888 F.2d 490, 499 (7th Cir.1989). The district court judge stated that the increase under section 2S1.3 was based on an analysis of all of the facts presented at the sentencing hearing, not just one in particular. He stated that he regretted the stringent sentence his findings and the Guidelines provisions required that he give to Hassan; and while he adhered to them, he sentenced her to the lowest amount of incarceration allowable under the Guidelines offense level.

Hassan cites *United States v. Safirstein*, 827 F.2d 1380 (9th Cir.1987), in support of her due process argument. The circumstances in *Safirstein*, a pre-Guidelines case, are similar to Hassan's situation but are not similar enough to require a sentencing reversal as occurred in *Safirstein*. Safirstein was sentenced for the same offense as Hassan. In making the sentencing determination, the district court sentenced the defendant to the statutory maximum because it found that defendant was involved in drug trafficking. The drug trafficking offense was not proven at trial nor supported by the record or presentence report. The only evidence the district court considered to conclude that the defendant was involved in drug trafficking was the amount of money in Safirstein's possession when he was arrested. *Id.* at 1385. The Ninth Circuit reversed the sentencing decision because it found that the district court violated the defendant's fifth amendment due process rights by relying on unreasonable inferences and assumptions unsupported by the record. *Id.* at 1387.

Hassan's case is very different. The district court judge based his decision on the preponderance of the evidence, and no single fact was determinative. Unlike *Safirstein*, the district court judge considered many factors before determining that Hassan knew or believed that the money she carried was criminally derived. Also, the district court did not sentence Hassan to the statutory maximum, but instead expressed uneasiness with the stringent sentence the Guidelines mandated in light of the court's findings.

■ Hassan argues that the information relied upon by the district court is invalid. *United States v. Barnes*, 907 F.2d 693, 695 (7th Cir.1990) (quoting *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972)), explains that " 'before making [a sentencing]

---

statement by Ogundipe's wife—that Ogundipe was involved in drug dealing—because it is hearsay. As stated before by this court, "[h]earsay is a staple in sentencing." *Escobar–Mejia,* 915 F.2d at 1154.

7. Hassan did use multiple aliases from the moment she arrived in the United States. The names given when she entered the country, on her apartment lease, on a currency transaction report, and on her airline ticket the day she was arrested, all differed.

determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" We note that, "'so long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence.'" *United States v. Miller*, 891 F.2d 1265, 1270 (7th Cir.1989) (quoting *United States v. Marshall*, 519 F.Supp. 751, 754 (D.Wis.1981), *aff'd*, 719 F.2d 887 (7th Cir.1982)); *see also United States v. Lueddeke*, 908 F.2d 230, 234 (7th Cir.1990). Indeed, our review of the record indicates that the information relied upon by the district court judge was sufficiently reliable, and was used properly by the judge in determining Hassan's sentence. Hassan did not present sufficient evidence to refute the evidence presented by the government, despite having the opportunity to do so. Hassan received the government's objection to the presentence report well in advance of the sentencing hearing, and the district court allowed for unlimited argument by both sides at the sentencing hearing.

■ This court gives great deference to a district court's sentencing determinations and is reluctant to disturb the district court's findings of fact unless clearly erroneous. *United States v. Cagle*, 922 F.2d 404, 406 (7th Cir.1991). After a careful examination of the evidence in the record, this court is not "'left with the definite and firm conviction that a mistake has been committed'" by the district court in sentencing Hassan. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)); *see also Cagle*, 922 F.2d at 406. We affirm the five-level increase under section 2S1.3(b)(1) of the Guidelines.

## B.  Obstruction of Justice

■ According to Guidelines section 3C1.1, "[i]f the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by 2 levels." Included as conduct worthy of application of the obstruction enhancement is "testifying untruthfully ... during a preliminary or grand jury proceeding, trial, sentencing proceeding, or any other judicial proceeding." U.S.S.G. § 3C1.1, comment. (n. 1(c)).[8]

We again review under the clearly erroneous standard, because "[t]he sentencing court's determination that a defendant obstructed justice is also a finding of fact." *United States v. Brown*, 900 F.2d 1098, 1103 (7th Cir.1990). This court does not determine the credibility of witnesses, but instead leaves that to the discretion of the trier of fact. *Id.*

The district court reviewed Hassan's testimony at the detention hearing and was convinced that she lied repeatedly. The magistrate conducting that hearing reached a similar conclusion. The district court judge also found that Hassan testified untruthfully at the sentencing hearing. The judge stated that he had a difficult time getting a straight answer from Hassan. The court carefully reviewed all of the facts presented, trying to make sense of Hassan's testimony, but found inconsistencies that indicated that Hassan lied throughout the hearing. Our review of the record finds no clear error in this determination by the district court, and given our deference to the district court in sentencing matters, we affirm the obstruction of justice enhancement.

---

**8.** The section 3C1.1 provision and application notes have been amended since Hassan's sentencing. The amendments would not have any effect on the application of the obstruction enhancement to Hassan's sentencing.