UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Earl SANDERS, Defendant–
Appellant.

No. 91–8030
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1991.

Charles McDonald, Waco, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., John A. Phinizy, Asst. U.S. Atty., Waco, Tex. and Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GARWOOD, HIGGINBOTHAM and BARKSDALE, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Charles Earl Sanders (Sanders) was convicted, pursuant to his guilty plea, of structuring transactions for the purpose of evading reporting requirements, in violation of 31 U.S.C. §§ 5324(3) and 5322(a). At sentencing, applying sections 2S1.3(a)(1)(A) and 2S1.3(b)(1) of the United States Sentencing Guidelines (USSG), the district court found Sanders to have known or believed the funds involved in the offense to be criminally derived property, accordingly increased his base offense level by 5 levels, and sentenced him to 37–months' imprisonment, a $6,000 fine, and 3 years of supervised release. Sanders challenges the district court's findings that he knew the funds involved were criminally derived property and its subsequent application of USSG § 2S1.3(b)(1) to increase his base offense level by five levels. We reject Sand-

ers' arguments and affirm the sentence imposed by the district court.

### Facts and Proceedings Below

In 1986, acting on information that Sanders' son, Lee Earl Sanders (Lee), was heavily involved in the Waco drug scene, the Waco Police Department initiated an investigation of the Sanders family. Their investigation revealed that Sanders, who was a sanitation worker for the City of Waco with an annual salary of $17,000, had, over a period of months, engaged in several transactions involving very large amounts of cash.

On June 20, 1988, Sanders purchased a new Cadillac that was selected by and delivered to his son Lee. Sanders made a cash down payment of $20,000 on the $33,821 purchase price, of which $4,700 was in $100 dollar bills and the remaining $15,300 was in denominations smaller than $100. The balance was financed for 48 months with payments of $473.63 a month. Because Lee had no verifiable legitimate source of income, investigators hypothesized that the Cadillac was purchased in Sanders' name to conceal the fact that Lee had large amounts of unexplained cash. Six months later, Sanders and his wife, using two separate cashier checks of $20,000 each, purchased a house and two acres of land in Waco. Investigation revealed that the house was apparently purchased for Lee, supposedly with proceeds of an insurance settlement. In January 1989, Sanders leased a building in Waco for $500 a month and established the "Shake It Club." Local authorities believed that the club was a front for narcotics trafficking and money laundering activities.

In April 1988, Sanders and his wife opened a savings account with a cash deposit of $5,000 at American Bank East in Waco. Through the end of 1988, there were total cash deposits of $32,569.36 and total check deposits of $1,153.33. Cash withdrawals for this period totalled $3,953.33, while only one check withdrawal was made, namely the $20,000 which was part of the cash payment on the house. Investigators examined one deposit of $15,-

000 made on November 16, 1988 in detail; they found that $6,100 of the deposit was in $100 dollar bills, while the remainder was in smaller denominations. No deposits were made in 1989, and $10,519.26 was withdrawn. The account was closed in September 1989.

Sanders simultaneously maintained a second account at Southwest Savings in Waco. During 1988, $27,656 in cash and $5,532 in checks were deposited to this account. On November 15, 1990, Sanders' wife made a $20,000 cash deposit to this second account, all in denominations smaller than $100.

On February 2, 1990, a series of simultaneous search warrants were executed at six locations in the Waco area, including Sanders' residence, his son's residence, and the "Shake It Club." Approximately $7,488 in cash was seized from Sanders, $2,100 from his son, and jewelry valued at $39,650 from both residences. Documents, described by investigators as drug ledgers reflecting a large-scale cocaine distribution network and transaction amounts in the tens of thousands of dollars, were found at the Shake It Club.

Investigators were unable to verify the source of much of Sanders' money. Between mid–1987 and mid–1989, Sanders had made expenditures of approximately $128,-000, excluding living expenses, which were about $17,500 (apart from taxes). During this period, Sanders was employed as a refuse truck driver with the City of Waco, earning approximately $17,000 a year. Sanders told the probation officer that he obtained the additional money from legitimate sources, including the sale of aluminum cans, gambling, money found in the wall of a residence belonging to a deceased uncle, unreported income from the Shake It Club, and an accumulation over a lifetime of gainful employment. As to none of these matters, however, were any specifics whatever mentioned.[1]

During investigation by the Internal Revenue Service (IRS), Sanders has admitted to being aware of requirements that banks report large deposits of currency to the federal government. He further admits that he split the cash and deposited it in two different banks on different dates to avoid these reporting requirements. He stated that he believed that the amounts had to be over $20,000 to be reported and that he did not want the federal government to know that he had $35,000 in cash.

Sanders was originally charged, along with his son and codefendant Lee, in a six-count indictment. Counts one through four alleged laundering of money instruments in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i); count five related to Lee only; count six provided for criminal forfeiture of real and personal property involved in the offenses. A superseding information charged the appellant with structuring transactions for the purpose of evading reporting requirements in violation of 31 U.S.C. §§ 5324(3) and 5322(a). Pursuant to a plea agreement, Sanders entered a guilty plea to the single count superseding information, and the government agreed to dismiss the original indictment as to the appellant at the time of sentencing.

The Presentence Report (PSR) established the base offense level at 13, and recommended adding 5 levels under § 2S1.3(b)(1) because Sanders knew or believed the funds involved in the offense were criminally derived property. Sanders' attorney objected to the entire section of the PSR describing the offense conduct, claiming that Sanders was not specifically involved with and had no knowledge of his son's alleged criminal activities, and denying that Sanders received any money from his son, or knew that any money involved in the offense was the product of illegal activities.[2]

---

1. Thus, not even approximate amounts or times are indicated; the uncle's name and the location of his residence are not reflected.

2. The objections to the PSR were filed by Sanders' attorney, were simply general allegations that Sanders did not know that the money was

criminally derived, and were not signed by Sanders or supported by his affidavit or by any other documentation or statement. These objections state generally that the "money was the result of insurance proceeds, gambling activities, gainful employment and inheritance." However, absolutely no specifics are given: no

At the sentencing hearing, Sanders' attorney argued against the recommended five-level increase in the offense level. In support of its position, the government called a special agent with the IRS. He testified, among other things, that over the two year period Sanders had expended some $128,000 for items other than ordinary living expenses, and that investigation revealed no legitimate source of funds other than Sanders' employment with the city of Waco. He also testified that an informant of established reliability he had known for three years advised him that Sanders had turned his narcotics business over to his son Lee. No objection was made to any of this testimony. Sanders presented no evidence. The district court specifically excluded from consideration testimony from Lee's trial, but accepted the factual determinations and recommendation of the PSR to increase the base level by five levels and not to reduce the level on the basis of acceptance of responsibility. The court ultimately imposed a sentence of 37 months' imprisonment, a $6,000 fine, and 3 years of supervised release. Sanders timely filed a notice of appeal.

On appeal, Sanders challenges the district court's findings and application of USSG § 2S1.3(b)(1) on essentially one ground. Sanders contends that there is no evidence that he received any criminally derived property or that he knew that the property he did receive was criminally derived, and therefore the district court erred in applying USSG 2S1.3(b)(1).

### Discussion

■ We begin by noting that we review application of the USSG fully for errors of law. *See United States v. Morales–Vasquez*, 919 F.2d 258, 263 (5th Cir.1990). Factual findings regarding sentencing factors, however, are entitled to considerable deference and will be reversed only if they are clearly erroneous. *See id.; United States v. Franco–Torres*, 869 F.2d 797, 800 (5th Cir.1989). A factual finding is not clearly

erroneous as long as it is plausible in light of the record read as a whole. *See United States v. Alfaro*, 919 F.2d 962, 964 (5th Cir.1990); *United States v. Fields*, 906 F.2d 139, 142 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 200, 112 L.Ed.2d 162 (1990). The district court's determinations at sentencing are made under the preponderance of the evidence standard. *See United States v. Casto*, 889 F.2d 562, 569–70 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990). "Sentences imposed as a result of incorrect application of the guidelines must be reversed." *Morales–Vasquez*, 919 F.2d at 263. We, however, find no such misapplication here.

■ The essence of Sanders' appeal is that the evidence was insufficient to warrant the five-level increase in sentencing level under USSG § 2S1.3(b)(1). USSG § 2S1.3 provides for a base offense level of:

"(1) **13,** if the defendant:

"(A) structured transactions to evade reporting requirements; or

"(B) made false statements to conceal or disguise the evasion of reporting requirements; or

"(C) reasonably should have believed that the funds were criminally derived property;

"(2) **5,** otherwise." USSG § 2S1.3(a).

Subsection (b)(1) allows an increase in the base level by five levels if "the defendant knew or believed that the funds were criminally derived property." Sanders argues that because the government has not proved the precise source of the funds, it has not met its burden of proving by a preponderance of the evidence that the money involved in the offense was illegally derived or that Sanders knew that it was illegally derived.

While the government does have the burden of proving the facts necessary to support an increase in sentence level by a preponderance of the evidence, we conclude that the government has met that burden

---

approximate dates or amounts are stated; nothing is stated to identify the insurance proceeds or the inheritance in any way, nor is it stated

what gainful employment (other than as a city of Waco truck driver) is referred to.

here. *See Alfaro,* 919 F.2d at 965. In *Alfaro,* this Circuit noted that "a presentence report generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making the factual determinations required by the sentencing guidelines." *Id.* at 966. The Court went on to express its doubts as to the reliability of defendant's objections to the PSR in the form of unsworn assertions because "[u]nsworn assertions do not bear 'sufficient indicia of reliability to support [their] probable accuracy', and, therefore, should not generally be considered by the trial court in making its factual findings." *Id.* (footnote omitted).

In the present case, the district court expressly based its finding that the five-level increase was appropriate on information contained in the presentence report. While Sanders' attorney did object to the trial court's reliance on the conclusion in the PSR that the funds were criminally derived, the objections were general unsworn assertions of the type in *Alfaro* that the trial court was not required to credit. Despite a full opportunity to present an explanation of the source of the funds, Sanders himself proffered no explanation at all to the trial court, and his attorney offered only wholly general unsubstantiated and unverifiable claims that the money was received from unidentified inheritance, insurance and "gambling." The oral explanations that Sanders did provide to the probation officer who prepared the PSR were likewise so nonspecific and unverifiable as to be discrediting. We hold that the trial court committed no error in failing to credit Sanders' objections and in relying on the PSR.

This conclusion is supported by the recent case of *United States v. Hassan,* 927 F.2d 303 (7th Cir.1991). In *Hassan,* a case with somewhat analogous facts, the Seventh Circuit affirmed the district court's five-level increase in the base offense level under USSG § 2S1.3(b)(1). The defendant in *Hassan* claimed that she did not know or believe that the money involved in the offense was criminally derived, and she challenged the factual findings of the district court in support of its five-level increase in base offense level. *Id.* at 306. The Seventh Circuit pointed out that the district court considered many factors before determining that Hassan knew or believed the money was criminally derived, and that the record indicated that the information the court relied on was sufficiently reliable and properly considered. *Id.* at 308–09. Factors that the court considered in increasing the base offense level included: a series of large deposits to and withdrawals from her bank accounts; money transactions that were frequently in cash in denominations smaller than $100; periods in which she deposited three times as much money in her bank account as she earned during that period; and a search of her person that revealed $4,000 in cash hidden in her underwear. *Id.* at 306. The Seventh Circuit noted that "Hassan did not present evidence to refute the evidence presented by the government, despite having the opportunity to do so." *Id.* at 309.

Several of the factors that the *Hassan* court considered in increasing the base level are also present in Sanders' case. The government in this case has shown that during a two-year period Sanders deposited four times as much money as he earned. His bank accounts show a series of large deposits and withdrawals, usually in cash. His business transactions were frequently in cash, in denominations smaller than $100. An authorized search of his residence uncovered $7,000 in cash. Jewelry worth some $39,000 was recovered from Sanders' residence and that of his son, who was shown to be involved in Sanders' furtive currency transactions. Sanders admittedly tried to conceal from the government his receipt of funds. His subsequent wholly unspecific and unverifiable statements about the sources of his funds were themselves suspicious. A factor not present in *Hassan* is the ledgers found at the Sanders' Shake It Club that indicated the existence of an extensive cocaine distribution network involving thousands of dollars. There were also other indications, albeit not individually more than minimally persuasive, of narcotics involvement on the part of Sanders and his son Lee. And,

despite thorough investigation, the government was unable to find any legitimate source of Sanders' funds. Finally, Sanders, like Hassan, "did not present sufficient evidence to refute the evidence presented by the government, despite having the opportunity to do so." Under all the circumstances, we find the evidence presented by the government, although largely circumstantial, to be at least minimally sufficient for the district court to conclude therefrom that Sanders knew or believed that the money was criminally derived and that the five-level increase was therefore warranted.[3]

### Conclusion

Having found Sanders' complaints of the district court's application of USSG § 2S1.3(b)(1) to be without merit, we accordingly affirm his conviction and sentence.

AFFIRMED.

---

**3.** We note that Sanders' reliance on *United States v. Mourning*, 914 F.2d 699 (5th Cir.1990), is misplaced; that decision, which upheld a § 2S1.3(b)(1) enhancement, does not in any way support his contentions that the evidence here is insufficient for that purpose.