**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Boisey BEVERLY, Delores Scott, Emanuel Brown, and Carl Sykes, Defendants–Appellants.**

**No. 89–3870.**

United States Court of Appeals, Fifth Circuit.

Jan. 4, 1991.

Rehearing Denied Feb. 13, 1991.

---

Frank Silvestri, New Orleans, La. (court-appointed), for Beverly.

John T. Mulvehill, Federal Public Defender, New Orleans, La. (court-appointed), for Scott.

George O'Dowd, New Orleans, La. (court-appointed), for Brown.

Steven Lemoine, New Orleans, La. (court-appointed), for Sykes.

Joseph Iuzzolino, Robert J. Boitmann, Asst. U.S. Attys., John Volz, U.S. Atty., New Orleans, La., for the U.S.

Before WISDOM, GARWOOD and JOLLY, Circuit Judges.

PER CURIAM:

Defendants Boisey Beverly, Carl Sykes, Emanuel Brown, and Delores Scott were convicted of various drug trafficking charges, including a conspiracy to possess and distribute drugs. They do not appeal this conviction. In the same trial they were also convicted for using a firearm in relation to those drug trafficking crimes.[1] They appeal this conviction. They contend that the evidence is not sufficient to connect the guns with the drug crimes.[2] We hold that the evidence is sufficient to show that the defendants, as members of an ongoing drug conspiracy, used the two revolvers in question "during and in relation to" the drug trafficking offenses. We therefore affirm.

I

On April 21, 1989, Charles Kilbourne, a car salesman, went to 464 Saint Andrew St., a three-story apartment building in the St. Thomas Project in New Orleans, Louisiana, and purchased an "eight ball"[3] of cocaine from Carl Sykes. Unknown to Kilbourne, agents of the Bureau of Alcohol, Tobacco, and Firearms ("BATF") had the building under surveillance. On May 10, 1989, two agents of BATF approached Kilbourne at his place of employment. Their persuasive powers secured his cooperation.

On May 14, after agreeing to cooperate, Kilbourne returned alone for more cocaine. At that time, an unidentified male ran up the stairs of 464 St. Andrew in the direction of Apartment F and returned with an unspecified amount of cocaine. Kilbourne handed some money to Sykes. Sykes, armed with a .32 caliber semi-automatic pistol, then escorted Kilbourne to his car. On May 31, Kilbourne, wearing a recording device, returned to 464 St. Andrew and purchased another eight ball of cocaine from Sykes. On June 6, Kilbourne returned to 464 St. Andrew, accompanied by special agent Sullivan of BATF. As they approached, Sullivan saw Emanuel Brown and Delores Scott leaning out of a window of Apartment F. Sullivan and Kil-

---

1. Section 924(c)(1) provides, in relevant part: Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....
18 U.S.C.A. § 924(c)(1) (West Supp. 1990).

2. Defendant Brown does challenge the sentence he received. We find no error in the sentence imposed on Brown and affirm the sentence.

3. An "eight ball" of cocaine is supposed to weigh three and a half grams. II R. 39.

bourne purchased 1.5 grams of cocaine from Sykes and Brown. Sullivan saw the outline of a handgun in the small of Sykes' back. When Sullivan asked Sykes whether he feared being "ripped off," Sykes responded that if anyone should try, "it would be like Vietnam around here."

On June 12, Sullivan returned and purchased approximately 1.7 grams of cocaine from Boisey Beverly and Brown. Beverly assured Sullivan that this cocaine, as well as the cocaine from the previous purchase, came from Apartment F. He said that his family and Sykes lived in the apartment. On June 15, Sullivan returned and purchased approximately 1.4 grams of cocaine from Delores Scott. After the purchase, Sullivan was escorted to his car by Beverly, who asked Sullivan if he was interested in purchasing any firearms.

The drug sales generally took place in front of the apartment building or on the staircase landings. The final purchase from Scott took place in the doorway to Apartment F, on the third floor. The evidence pointed clearly to the fact that the cocaine was being kept in Apartment F, and on June 23, BATF obtained a warrant to search that apartment. The search of the three bedroom apartment turned up one gram of cocaine, two revolvers, and $2200 in cash, of which ten dollars was identified as coming from the June 6th sale. The two revolvers were found in a safety deposit box under a mattress in one of the bedrooms where one-half gram of cocaine was also found.

## II

The defendants were indicted for violations of Title 21 U.S.C. § 841(a)(1) & 846, and Title 18 U.S.C. § 924(c)(1). Specifically, the grand jury indictment under § 924(c)(1) described the weapons as "(1) one Smith and Wesson .357 Magnum revolver, model 19–5 serial number ANF3074 and (2) one Rossi, 38 caliber revolver serial number D718143". None of the weapons the witnesses testified to having seen on the defendants fitted the description in the indictment. In addition to the firearms count, each of the defendants was indicted

on one count of conspiring to distribute cocaine. Boise Beverly and Carl Sykes were each indicted of one count of distributing cocaine. Emanuel Brown was indicted of two counts of distributing cocaine. Delores Scott was indicted of one count of distributing cocaine and one count of possession with intent to distribute. On September 26, 1989, the jury found the defendants guilty on all counts.

At the conclusion of the Government's case, all defendants moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure with respect to the weapons count, arguing that the government introduced no evidence to indicate that the two particular revolvers described in the indictment facilitated the drug trafficking offenses. The trial judge denied the motion, stating:

> [I]f, with respect to anyone of them, the gun was in their possession during and in furtherance of, during and in relation to the drug trafficking crime, then they are all guilty of the weapon offense. And I hold that a reasonable trier of fact could have concluded that these weapons were in the possession of at least one or more of the co-conspirators in furtherance of the conspiracy, and during and in relation to the drug trafficking crime of possession with intent to distribute, or the distribution.

The defendants appeal.

## III

### A

■ When reviewing a conviction for the sufficiency of the evidence, we view the evidence in the light most favorable to the guilty verdict, drawing all reasonable inferences and resolving credibility choices in favor of the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Hernandez–Palacious*, 838 F.2d 1346, 1348 (5th Cir.1988). The standard is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.

1982) (en banc), *aff'd* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

## B

■ In 1984 Congress revised § 924(c). Before 1984, § 924(c) made it a crime to "(1) us[e] a firearm to commit any felony ..., or (2) carr[y] a firearm unlawfully during the commission of any felony ..." [4] The 1984 amendment combined these two sections, making it a crime to use or carry a firearm "during and in relation to" any federal crime of violence.[5] In 1986, Congress again amended § 924(c) substituting "crime of violence or drug trafficking crime" for "crime of violence," as the predicate offense.

In discussing the 1984 amendments, the Committee Report stated that the phrase "and in relation to" was intended to preclude application of section 924(c) to situations where "[the firearm's] presence played no part in the crime, such as a gun carried in a pocket and never displayed or referred to in the course of a pugilistic barroom fight." [6] Thus, after the 1984 amendment, mere possession without more would not support a conviction under section 924(c).[7] The Committee Report, however, also stated that possession of a gun, though never displayed or referred to, "could nevertheless support a conviction for 'carrying' a firearm in relation to the crime if from the circumstances or otherwise it could be found that the defendant intended to use the gun if a contingency arose or to make his escape." [8]

There is no doubt that cocaine was kept in Apartment F, nor is there any doubt that the defendants were engaged in an ongoing conspiracy to distribute cocaine from that apartment. There is also no doubt that firearms are drug traffickers' tools of trade, and that the defendants in this case consistently used weapons in furthering

their drug trafficking business. The question this case presents is whether the jury may reasonably infer that the two revolvers and ammunition, found in a safety deposit box under a mattress in a bedroom where cocaine was found, and in the apartment that served as the distribution center of the conspiracy, were used "during and in relation to" the drug trafficking offenses.

The defendants argue that there is insufficient evidence to link these weapons with the drug distribution. Because of this missing link, they further argue that they were convicted for mere possession of the weapons which is contrary to the intent of Congress. We disagree.

We are particularly persuaded by our case of *United States v. Molinar–Apodaca*, 889 F.2d 1417 (5th Cir.1989). In that case, ten co-defendants were charged with conspiracy to distribute drugs over a thirteen-month period. One of the defendants was also charged with possession of a firearm during the commission of a narcotics offense. The police arrested that defendant at a house wherein they found an Uzi rifle, a loaded forty-five caliber handgun, additional ammunition for both weapons, and $11,000 in a locked safe. No drugs were found in the house. In a nearby shed, however, police officers found 142 pounds of marijuana. No weapons, however, were found in the shed.

At the trial, apparently no evidence was presented that any of the ten co-defendants ever used, threatened to use, or possessed a weapon during any of the specific instances of drug distributions during the 13 month long drug conspiracy. *Id.* at 1419–23. Nevertheless, the jury returned a guilty verdict on the weapons charge. We affirmed, holding that the evidence was sufficient to support the jury's verdict. We noted that "the Government is only obligated to show that the firearm was

---

**4.** 18 U.S.C. § 924(c) (1982).

**5.** Comprehensive Crime Control Act of 1984, Title X, Part D, Pub.L. No. 98–473.

**6.** S.Rep. No. 225, 98th Cong., 2d Sess. 1, 314 n. 10 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3492 n. 10.

**7.** *See United States v. Feliz–Cordero*, 859 F.2d 250, 254 (2d Cir.1988).

**8.** S.Rep. No. 225, 98th Cong., 2d Sess. 1, 314 n. 10 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3492 n. 10.

available to provide protection to the defendant in connection with his engagement in drug trafficking; a showing that the weapon was used, handled or brandished in an affirmative manner is not required." 889 F.2d at 1424 (*citing United States v. Raborn*, 872 F.2d 589, 595 (5th Cir.1989)).

The facts supporting the jury's verdict in the instant case are, indeed, more compelling than in *Molinar–Apodaca*. In reaching its verdict, the jury heard testimony that on at least one occasion, Carl Sykes, while armed with a semi-automatic handgun, escorted Charles Kilbourne to his car following Kilbourne's purchasing cocaine from Sykes at 464 St. Andrew. Furthermore, the record reflects that the co-conspirator Boisey Beverly indicated that he could supply Agent Sullivan with firearms. On June 6, 1989 while purchasing cocaine from Sykes, Agent Sullivan saw what from his experience he believed to be the outline of a handgun under Sykes' shirt. When asked by Agent Sullivan if he was afraid of being "ripped off," Sykes responded that "it would be like Vietnam around here!" The inference reasonably to be drawn from this comment is that Sykes and his co-conspirators possessed fire power, and they were deadly serious about using it to protect their retail drug business. Furthermore, the jury found that the defendants were involved in an *ongoing* drug distribution conspiracy from April 21 to June 23, pursuant to which drugs were sold at and distributed from the apartment. The apartment where the guns were found was being used as both the storage site and the retail outlet for their cocaine distribution. The guns were found with ammunition in a bedroom containing cocaine. Delores Scott, moreover, was found in the apartment in possession of approximately $2,200 in cash, ten dollars of which came from the June 6, 1989 sale of cocaine by Carl Sykes to Emanuel Brown to Agent Sullivan. A

jury thus could reasonably connect the cash to the drug trafficking, and infer that these specific guns were used as protection "in relation to" both the ill-gained cash and drugs found in the room.

Given this evidence, we find it easy to conclude that the defendants, in the words of the Committee Report, "intended to use the gun[s] if a contingency arose" and "used" the guns identified in the indictment "as a means of safeguarding and facilitating illegal transactions and as an integral means of protecting [their] possession of the cocaine." *United States v. Robinson*, 857 F.2d 1006, 1010 (5th Cir. 1988).[9]

## IV

For the reasons stated above, we affirm defendants' respective convictions for violation of 18 U.S.C. § 924(c)(1).

---

9. The Second Circuit recently considered a similar situation and held that the discovery of a handgun in a desk drawer in an apartment from which drugs were sold is not a sufficient basis, by itself, to support a conviction under section 924. *See Feliz–Cordero*, 859 F.2d at 254. The Second Circuit rationalized its holding by noting that neither the location of the firearm nor

other circumstances suggested that the possessor of the firearm intended to use the firearm during the drug transactions. *United States v. Wilson*, 884 F.2d 174, 177 (5th Cir.1989). In our case we note one particular difference: we have an express warning that sizeable fire power would be used if it became necessary to protect/further the drug conspiracy.