**UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,**

v.

**Michael Wesley O'BANION, Defendant–Appellant, Cross–Appellee.**

No. 90–2675.

United States Court of Appeals, Fifth Circuit.

Oct. 1, 1991.

Rehearing and Rehearing En Banc Denied Nov. 14, 1991.

Lawrence A. Walsh, Walsh & Associates, Brownsville, Tex., for defendant-appellant, cross-appellee.

· Jeffery A. Babcock, Paula C. Offenhauser, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee, cross-appellant.

Before REYNALDO G. GARZA, WIENER, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge.

Michael Wesley O'Banion appeals his conviction for knowingly importing monetary instruments in excess of $10,000 without reporting them, in violation of 31 U.S.C. § 5316. The principal issue is the sufficiency of the evidence concerning whether he knowingly and willfully violated the currency reporting laws, in light of his claim that he thought he could divide the currency with his two companions. On cross-appeal, the government challenges the sentence not including imprisonment (only a fine and supervised release, including home confinement, imposed). We AFFIRM IN PART, REVERSE IN PART, and REMAND.

## I.

On December 11, 1989, O'Banion, accompanied by his employees Leo Flores and Warren Redlund, was returning to the United States from a business trip to Mexico. Its purpose was to collect accounts receivable from Mexican customers for O'Banion's meat and poultry business, the Crown Trading Company. The three men, in O'Banion's pickup truck and with him driving, entered a border inspection station at Brownsville, Texas. Inspector Martinez asked them if they had anything to declare, and they responded that they wished to declare some liquor and beer. Martinez referred them to the secondary inspection area.

At the secondary area, Inspector German gave O'Banion a second opportunity to make a general declaration of any reportable items.[1] As before, O'Banion responded that he had only liquor and beer to declare. German then inspected the truck and discovered, on the front seat, a paper sack that contained bundles of United States currency. German asked O'Banion if he (German) had earlier requested a money declaration. German testified on direct examination that O'Banion responded "yes", but stated on cross examination that he was not sure if O'Banion gave a response, because German had not noted it in his report. German asked how much money was in the bag; and O'Banion, after asking Flores, replied that it contained $12,000. (It contained $12,063.)

German then asked O'Banion why he had not declared the money. According to German's testimony, O'Banion stated that he thought the amount of currency could be split among the three occupants for purposes of the reporting requirement.[2] German also testified, disputed by O'Banion, that O'Banion had claimed that the money belonged to all three men.

German escorted O'Banion, Flores, and Redlund into the customs building. Senior Inspector Oliver interviewed O'Banion; and Inspector De los Santos, together with German, searched O'Banion and his companions. The inspectors discovered additional money and checks in O'Banion's shirt and pants pockets. They found approximately $1,461 in negotiable checks and $715 in cash in his shirt pocket, along with $85,699 in non-negotiable checks on his person. They also found $4271 in Flores' socks and $9950 in Redlund's. A search of the truck uncovered $890 in O'Banion's vinyl folder.

Later, after O'Banion had been interviewed by Agent Hegmann, as discussed *infra,* De los Santos noticed that O'Banion's foot was slightly raised. He then searched O'Banion's shoes and discovered an additional $1050 in currency. O'Banion testified that he did not remember that this currency was in his socks until after agents searched his clothing and he had spoken with Agent Hegmann.

The inspectors located a total of approximately $30,400 in currency and negotiable checks within the pickup truck and on the three men. O'Banion offered proof that the money came from legitimate business sources in Mexico. All the funds belonged to either him or his business.

When Agent Hegmann interviewed O'Banion, he asked why O'Banion had not declared the money. O'Banion reiterated his belief that he could divide the currency three ways. He also stated: "I guess I was tired. I just didn't feel like messing with it." When asked, at trial, why he did not inform the customs inspectors of the additional hidden funds once the initial $12,000 was discovered, O'Banion responded that he was in shock and that he "didn't know what to do." Once they discovered the $12,000, the customs authorities did not offer O'Banion an opportunity to fill out the Currency Monetary Instrument Report (CMIR).

1. German did not recall specifically whether he asked for a *monetary* declaration as part of his general declaration question prior to searching O'Banion's truck.

2. Although under O'Banion's reasoning he would still be violating the law if such splitting were allowed, because he and his two employees were transporting over $30,000 in cash and negotiable instruments, O'Banion testified that he thought they were carrying only approximately $29,000; that he forgot about the approximate $1,700 he was carrying when he left the United States.

O'Banion testified that he had traveled to Mexico "many, many times." On previous occasions, he had read United States Customs signs outlining the requirements concerning importing currency into the United States.[3] However, he testified that he did not understand the terms of the warning.

Moreover, in 1982, after O'Banion imported $20,000 in United States currency without reporting it, customs agent Cunningham informed him of the currency reporting requirements. Cunningham told O'Banion that he had to report the importation of any currency over the then statutory limit of $5000. Furthermore, O'Banion had collected money in Mexico four or five times and, on at least one occasion, had participated in filling out a CMIR with his employee Flores.

O'Banion testified that he, Flores, and Redlund hid the currency and checks in their clothes for security reasons while shopping in Mexico. However, they left a large bundle of money unattended in their pickup when they shopped in a convenience store. O'Banion testified that he "just felt better carrying part of it. If we got robbed, we got robbed with less than all of it."

O'Banion was indicted for "knowingly transport[ing] and attempt[ing] to transport monetary instruments of more than $10,000.00, namely, $29,000.00 in United States currency, to a place in the United States ... from a place outside the United States" without filing a report, in violation of 31 U.S.C. § 5316(a)(1)(B).[4] He was tried before a jury and found guilty. In sentencing, the district judge imposed a $20,000 fine, a $50 special assessment and four years probation, including 120 days of home confinement.

## II.

O'Banion challenges his conviction and sentence on grounds of insufficiency of the evidence, erroneous jury instructions, im-

proper closing argument, an erroneous fine, and the unconstitutionality of § 5316.

## A.

O'Banion challenges the sufficiency of the evidence to prove that he (1) had actual knowledge of the currency reporting laws; (2) knowingly transported $29,000 into the United States; and (3) acted willfully and possessed the requisite specific intent for a conviction under § 5316(a)(1)(B). That statute provides in part:

> [A] person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—
>
> > (1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—
> >
> > .    .    .    .    .
> >
> > (B) to a place in the United States from or through a place outside the United States....

"In order to establish guilt for failure to file a currency and monetary instrument report under 31 U.S.C. § 5316(a), the government must show that the defendant had actual knowledge of the currency reporting requirement and voluntarily and intentionally violated that known legal duty." *United States v. Berisha*, 925 F.2d 791, 795 (5th Cir.1991) (citing *United States v. Salinas–Garza*, 803 F.2d 834 (5th Cir.1986)).

It is well established that "[i]n evaluating a challenge to the sufficiency of the evidence, a court must view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt." *Berisha*, 925 F.2d at 795 (citations omitted). All reasonable inferences and credibility choices must be made in favor of the jury's verdict. *Glasser v. United States*, 315 U.S.

---

**3.** The government introduced a photograph of one sign, which stated, in part: "If you transport, attempt to transport, or cause to be transported ... more than $10,000 in currency of the United States or any other country, or monetary instruments (such as ... negotiable instruments in bearer form ...) into or out of the United

States, you must file a report with U.S. Customs."

**4.** Although O'Banion was carrying negotiable instruments which must be reported under § 5316 just as currency, O'Banion was indicted only for failure to report the currency.

60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Beverly*, 921 F.2d 559, 561 (5th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 2869, 115 L.Ed.2d 1035 (1991). We conclude that there was sufficient evidence to support the verdict.

### 1.

■ Concerning lacking knowledge, O'Banion relies on our decisions in *United States v. Granda*, 565 F.2d 922 (5th Cir. 1978), and *United States v. Schnaiderman*, 568 F.2d 1208 (5th Cir.1978). In each, this court reversed the conviction for failure to complete a currency reporting form. It based its decision on, among other things, the lack of evidence that defendants had knowledge of the reporting requirements. In *Granda*, for example, it held "that the terms *knowing* and *willful* require proof of the defendant's knowledge of the reporting requirement[s]". 565 F.2d at 925–26 (emphasis in original). Further, as a prerequisite to conviction, it required that the government take measures to inform travelers of the reporting requirements: "Proof of the requisite knowledge ... is almost impossible unless affirmative steps are taken by the government to make the laws' requirements known." *Id.* at 926.

In *Schnaiderman*, this court applied *Granda* to hold that the evidence was insufficient to support a conviction. It reversed "because the government took no steps to bring the reporting requirements to [defendant's] attention and there is no indication he actually knew of the reporting requirements." 568 F.2d at 1213. *Schnaiderman* was a "no evidence" case; on review of the record, this court found the record empty of evidence from which the jury could conclude that the defendant willingly failed to report, knowing that a report was required by law. *Id.*

By contrast, the government took steps to make the reporting requirements known to O'Banion. In 1982, customs agent Cunningham explained the currency reporting requirements to him in person and by telephone. And subsequently, O'Banion had participated in filling out a currency declaration form and had read the customs signs explaining to travelers their duty to declare currency over $10,000. Moreover, in *United States v. Salinas-Garza*, 803 F.2d 834 (5th Cir.1986), this court held that, in the case of persons crossing a border who were not automatically required to fill out a declarations form, the use of signs to put travelers on notice of the reporting requirements was sufficient. It ruled that because the defendant "was put on notice by the signs, the government has met its burden of proving knowledge." *Id.* at 839.

This case is more analogous to the earlier cited *Berisha* than to *Granda* or *Schnaiderman*. In *Berisha*, we affirmed defendant's conviction, despite his claim that he was unaware of one of the intricacies of the currency reporting law. Berisha claimed "that he believed that since he was carrying only $8,000 of his own money and $9,000 for his companion, he was not required under the statute to report the money to the authorities." 925 F.2d at 795. We find that O'Banion's justification for his actions—his belief that he could split the currency three ways—is like Berisha's self-serving explanation. The jury was entitled to reject O'Banion's statements about his state of mind and find that he had actual knowledge of the reporting requirements.

### 2.

O'Banion asserts that the evidence was insufficient to show that he knowingly transported approximately $29,000 in United States currency into the United States. He contends that because all of the currency was not in his physical possession when he reached the border checkpoint, he did not "transport" it within the meaning of § 5316. As stated, O'Banion was indicted for "knowingly transport[ing] and attempt[ing] to transport monetary instruments of more than $10,000.00, namely, approximately $29,000.00 in United States currency, to a place in the United States ... from a place outside the United States." The district court instructed the jury that it must find that O'Banion "knew that he must report monetary instruments in excess of $10,000"; that he "did in fact transport monetary instruments in excess of $10,000 at one time into the United

States"; and that he "knowingly and willfully failed to report or declare the monetary instruments in excess of $10,000." (These instructions are discussed further in part II.B.)

In addressing this contention, we draw guidance from our recent decision in *United States v. Morales–Vasquez*, 919 F.2d 258 (5th Cir.1990). There, we considered whether a defendant's actions in dividing currency he owned among himself and his three companions was a "structuring offense" for the purposes of the sentencing guidelines. *Id.* at 263. *See* U.S.S.G. § 2S1.3(a)(1)(A). The defendant and each bailee had crossed the border with roughly half of the $10,000 statutory limit. We upheld the conviction, even though the defendant had been indicted under the "about to transport" language of § 5316, indicating that he was the person who transported.[5] It did not matter that the indictment did not charge the defendant with having directed others to import currency without reporting it; we viewed the owner of the currency as the person who "transports" within the meaning of the statute. We stated:

> Section 5316 places the reporting burden on the individual who wishes to export more than $10,000, and a violation may occur in at least two ways: a single unreported import or export of more than $10,000 is a violation; further, if the

individual, intending to evade the reporting requirement, divides the money into amounts each less than $10,000 and places the bundles with bailees, he has committed an offense regardless of whether the bailees cross the border in a common vehicle or in a caravan.

919 F.2d at 264 (footnote omitted).

■ In the alternative, the indictment under which O'Banion was prosecuted was not insufficient if he was subsequently convicted of transporting over $10,000, the statutory limit, and not all $29,000, the amount alleged in the indictment. As noted, the instruction required only that the jury find that O'Banion transported over $10,000, the statutory limit. "An indictment, to be sufficient, need merely allege that the defendant committed each of the essential elements of the crime charged so as to enable the accused to prepare his defense and to invoke the double jeopardy clause in any subsequent proceeding for the same offense." *United States v. Oberski*, 734 F.2d 1034, 1035 (5th Cir.1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 797, 83 L.Ed.2d 790 (1985) (citations omitted). Accordingly, even if O'Banion's theory were correct and he could only be convicted if he personally transported greater than $10,000, the jury was entitled to find that O'Banion controlled the $12,000 on the front seat of his vehicle, which he was driving. Given this reasonable inference,

---

5. The indictment had stated that the defendant was "knowingly about to transport, at one time, monetary instruments ... in excess of $10,000...." 919 F.2d at 260 n. 2. In 1986 the language "transports, is about to transport, or has transported" in § 5316 was substituted for "transports or has transported, or attempts to transport or have transported." Pub.L. 99–570 (1986). The same statute also authorized the Secretary of the Treasury to issue regulations defining the terms "at one time" in § 5316(a). *Morales–Vasquez*, 919 F.2d at 262. "As a result of this statutory authorization, the Treasury, effective August 7, 1989, created a definition of 'at one time' for inclusion in the [currency reporting act] regulations, intending 'to make clear that structuring schemes involving the international transportation and receipt of monetary instruments are illegal to the same extent that structuring schemes to evade the domestic currency transactions reporting requirements ... are illegal.'" *Id.* (quoting 54 Fed.Reg. 28,-416–17 (July 6, 1989)).

The Treasury Regulation definition of "at one time" reads in its entirety:

> For purposes of § 103.23 of this part, a person who transports, mails, ships or receives; is about to or attempts to transport, mail or ship; or causes the transportation, mailing, shipment or receipt of monetary instruments, is deemed to do so 'at one time' if:
> (1) That person either alone, in conjunction with or on behalf of others;
> (2) Transports, mails, ships or receives in any manner; is about to transport, mail or ship in any manner; or causes the transportation, mailing, shipment or receipt in any manner of;
> (3) Monetary instruments;
> (4) Into the United States or out of the United States;
> (5) Totaling more than $10,000;
> (6)(i) On one calendar day or (ii) if for the purpose of evading the reporting requirements of § 103.23 on one or more days.

31 C.F.R. § 103.11(a) (1990).

the jury was entitled to conclude that O'Banion "transported" both the money stuffed in his clothing and shoes and the currency found in the vehicle.

### 3.

■ Next, O'Banion contends that the evidence was insufficient to prove that he acted willfully and with specific intent to violate § 5316. He relies on our decision in *United States v. Warren,* 612 F.2d 887 (5th Cir.) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), in which we approved the validity of the opinions in *Granda* and *Schnaiderman,* holding that "the defendant [must] have *actually known* of the currency reporting requirement and have *voluntarily and intentionally violated the known legal duty* in order to be convicted of the crime." *Id.* at 890 (emphasis added).

O'Banion contends that, because of the justifications he offered for his behavior, a reasonable jury could not have found that he intentionally violated his duty to declare currency. The only reasonable inference the jury could draw, O'Banion asserts, is that he hid the money for security reasons. We disagree.

The jury could find that O'Banion acted with specific intent for the same reasons it could find that he possessed actual knowledge. For example, Agent Cunningham had warned him about the currency reporting requirements on a separate occasion. As another example, O'Banion and his employees, while claiming they hid money for security reasons, nonetheless left $12,000 in a paper bag in the pickup truck while shopping. And as another example, O'Banion and his employees failed to volunteer the existence of additional monies when the original $12,000 was discovered; and, even when searched, O'Banion still failed to disclose the money hidden in his shoes. Need-

less to say, the jury could find specific intent based on circumstantial evidence. "Intent may, and generally must, be proven circumstantially. Generally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying the act, even when a particular mental attitude is a crucial element of the offense." *United States v. Maggitt,* 784 F.2d 590, 593 (5th Cir.1986).

### B.

O'Banion contends that the district court erred in failing to instruct the jury, as requested, (1) on the definition of "actual knowledge"; (2) that it had to find that O'Banion acted with specific intent; and (3) on the proper definition of "willfully". O'Banion contends also that the trial court did not properly instruct the jury on O'Banion's defense: that he thought the currency could be split three ways, because there were three travelers.

Of course, in reviewing instructions, we must consider "'whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" *United States v. Stacey,* 896 F.2d 75, 77 (5th Cir.1990) (quoting *United States v. August,* 835 F.2d 76, 77 (5th Cir.1987)). Moreover, "[a] trial judge is afforded broad discretion in formulating jury instructions; and the refusal to adopt a defendant's proposed instruction warrants reversal only where the charge, considered as a whole, does not accurately reflect the issues, law, and defenses of the case." *United States v. Natel,* 812 F.2d 937, 942 (5th Cir.1987).

As noted, O'Banion was entitled to an instruction that a violation of § 5316 requires that he have actual knowledge of the currency reporting laws.[6] However,

---

**6.** O'Banion requested the following instruction:
Actual knowledge that the law prohibited the Defendant from considering the number of other individuals with him (i.e., that one cannot multiply $10,000 by the number of individuals traveling together) is an essential element of the offense charged. You may not find the Defendant guilty unless you find beyond a reasonable doubt that he knew that he was prohibited from considering the number

of other individuals with him (i.e., that he did not have to make a declaration if he believed that they were carrying under $30,000 between them). It is not sufficient to show that the Defendant may have suspected or thought that he was required to make a declaration.
The fact of knowledge, however, may be established by direct or circumstantial evidence just as any other fact in the case.

the district court gave one, instructing the jury, in part, as follows:

> There are three things—and you must find all three of these things before you can find the defendant guilty of the offense as charged in the indictment.
>
> Number one, that the defendant ... had knowledge of the reporting requirement. That he knew of the reporting requirement and that he knew that he must report monetary instruments in excess of $10,000.

This instruction is an accurate statement of the law. Together with the balance of the charge, as discussed in part below, it informed the jury that if it found that O'Banion was under a mistaken belief concerning the law, including that he thought he could divide the currency by the number of travelers, it should acquit him based on a lack of knowledge of the reporting requirements.[7]

■ O'Banion contends likewise that the district court erred both in not instructing the jury on specific intent and in failing to define properly the term "willfully". The district court instructed the jury as follows:

> "Willfully" means that you did what you did voluntarily and purposely, because you wanted to do it and with the specific intent to do something that the law forbids, with the specific intent to do something that the law forbids.

The court's instruction encompasses the substance of O'Banion's requested instruction on specific intent.[8]

Moreover, O'Banion's proposed instruction defining "willfully" is virtually identical to that given by the court, with the

exception of the omission of the "bad purpose" language.[9] We examined a similar claim in *United States v. Hunt,* 794 F.2d 1095, 1100 (5th Cir.1986) and rejected the argument that "a fair trial can occur only if the judge utters the magic words 'with bad purpose.'"

We conclude that the jury charge as a whole accurately summarized the law and took into account O'Banion's defense. By informing the jury that O'Banion had to have actual knowledge of the currency reporting laws and that he had to have acted willfully in failing to file a report, the district court informed the jury that it should acquit O'Banion if he did not know he was violating the currency reporting laws.[10]

### C.

O'Banion challenges the district court's failure to sustain his objection to a comment by the prosecutor during closing argument. He asserts that the comment was both an attack on his attorney—a suggestion that his attorney had suborned perjury—and impermissibly implied that O'Banion had a duty to establish his innocence. The remark was an attempt to discredit O'Banion's explanation that he hid the money for security reasons, in light of the fact that O'Banion did not initially offer this explanation to the inspectors. The prosecutor stated:

> Why didn't they tell the inspectors then? What would an innocent man have done at that point? You would have told them everything.... But he didn't do that.... The first time it comes out is

---

**7.** In closing argument, O'Banion's counsel stated: "[O'Banion] must have had actual knowledge that the law prohibited him from considering the other people with him. Actual knowledge of that. By that I mean that Mike must have had actual knowledge that he could not multiply the $10,000 requirement by the number of people with him. This is an essential element of the offense."

**8.** O'Banion requested the following instruction: The crime charged in this case is a serious crime which requires proof of specific intent before the Defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent the government must

prove that the Defendant willfully and knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all of the facts and circumstances surrounding the law.

**9.** The following instruction was requested:

An act is done "willfully" if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

**10.** In the alternative, even if there was error, it was harmless. O'Banion's substantial rights were not impaired by the charge. Fed. R.Crim.P. 52(a).

several weeks later when they send a letter to the District Director, after he has talked to ... his attorney. That's when they came out with the story.

The following statements were then made:

[DEFENSE COUNSEL]: Your Honor, I object to that last statement, insinuating that I might have advised my client of something like that.

THE COURT: Remember my instructions, ladies and gentlemen of the jury.

■ "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's arguments standing alone". *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). We may not reverse O'Banion's conviction based on prosecutorial misconduct unless the prosecutor's remarks were not only inappropriate but were also harmful. *United States v. Chase*, 838 F.2d 743, 749 (5th Cir.), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 609 (1988). We must determine from the record whether the argument "affected substantial rights of the accused." *Id.*

■ When O'Banion objected, the district judge admonished the jury to remember his earlier statement that lawyers' questions are not evidence. But even if we assume *arguendo* that the district court erred in not giving a more detailed cautionary instruction, the error is harmless. O'Banion has not shown that the prosecutor's comment affected his substantial rights. Fed.R.Crim.P. 52(a).

### D.

O'Banion asserts next that the district court committed error in assessing the $20,000 fine. The Pre–Sentencing Investigative Report (PSI) calculated O'Banion's net worth at over $478,000. He objected to this calculation and submitted a letter from his attorney stating that he had "a net worth of about $3,000 to $5,000." And at sentencing, O'Banion advised that he had commenced bankruptcy proceedings two and one-half weeks prior to the hearing.

The sentencing guidelines provide that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The guidelines likewise provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." U.S.S.G. § 5E1.2(e). A district court may waive the fine or assess a fine below the guideline range set in § 5E1.2(c)(3) "[i]f the defendant establishes that (1) he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required [under the guidelines], or (2) imposition of the fine would unduly burden the defendant's dependents...." U.S.S.G. § 5E1.2(f).

■ Assuming, as the probation officer recommended, that appellant's conduct and prior history mandated an offense level of either 11 or 13, the fine fell within the guideline range. *See* U.S.S.G. § 5E1.2(c)(3). We give great deference to a district court's sentencing decision when it falls within the guideline ranges. *United States v. Matovsky*, 935 F.2d 719, 721 (5th Cir.1991); *United States v. Goodman*, 914 F.2d 696, 698 (5th Cir.1990). And, we accept findings of fact made during sentencing that are not clearly erroneous. *Goodman*, 914 F.2d at 697–98; *United States v. Mejia–Orosco*, 867 F.2d 216, 221 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989). On the other hand, we review *de novo* a district court's interpretation of the guidelines. *United States v. Lara–Velasquez*, 919 F.2d 946, 953–54 (5th Cir.1990).

■ In imposing a fine, one factor the sentencing judge must consider is "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources". U.S.S.G. § 5E1.2(d)(2). The record belies O'Banion's assertion that "[t]he only evidence the Court considered in its determination of Appellant's ability to pay a fine was Appellant's financial statement." Rather, the district court reviewed the evidence and elicited comments from O'Banion at the sentencing hearing on the status of

the respective assets listed in the PSI. It determined that there was sufficient equity in some of the assets to enable O'Banion to pay the fine currently. The finding that O'Banion was able to pay a fine of $20,000 is not clearly erroneous.[11]

### E.

■ O'Banion also raises three constitutional claims. He asserts that his sentence constitutes cruel and unusual punishment in violation of the eighth amendment; and that § 5316, as applied to him, violates both the due process clause of the fifth amendment and the equal protection clause.[12] We decline to address the equal protection claim, because O'Banion raises it for the first time on appeal and it does not pass muster as plain error. *See Aguirre v. Armstrong World Indus., Inc.*, 901 F.2d 1256, 1258 (5th Cir.1990) ("This Court will not address an issue raised for the first time on appeal unless it is a purely legal issue and the refusal to consider it would result in a miscarriage of justice."); *United States v. Wilson*, 894 F.2d 1245, 1250 (11th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990) (same rule for constitutional issues). As for the other two constitutional claims, we hold that O'Banion's conviction and sentence did not offend either the eighth amendment or the substantive component of the fifth amendment due process clause.

### 1.

For his eighth amendment claim, O'Banion argues that requiring a report of the importation of money derived from legitimate business does not accord with the legislative purpose of § 5316. He asserts that a less restrictive alternative—a misdemeanor penalty—is available to serve the same ends as the felony provision of

§ 5316. O'Banion contends that the felony punishment violates the proportionality requirement of *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). *See United States v. Lemons*, 941 F.2d 309 (5th Cir.1991).[13] Although *Solem* involved an eighth amendment challenge to a *state* conviction, federal courts have applied a similar analysis in reviewing *federal* convictions. *See, e.g., Id.; United States v. Sullivan*, 895 F.2d 1030 (5th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 207, 112 L.Ed.2d 168 (1990).

■ An examination of the statutory scheme reveals that the detection of criminally-derived money was not the only purpose behind the enactment of § 5316. The statute criminalizes a person's failure to make a declaration when importing over $10,000, whether or not the money was derived from legitimate business. 31 U.S.C. § 5316(a). O'Banion raises no colorable argument that the statute does not extend to cover his conduct. And, given that Congress made a policy decision to criminalize, and indeed felonize, the willful failure to report the importation of $10,000 of "clean money", O'Banion offers no persuasive reason that the eighth amendment forbids it to do so.

Assuming that Congress may criminalize the willful failure to report the importation of $10,000 of legitimate business proceeds, O'Banion maintains that a felony penalty is disproportionate to the crime, under the reasoning of *Solem*. The Supreme Court stated in *Solem* that "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the

---

11. O'Banion asserts that the district court should have weighed his total assets against total liabilities rather than analyzing his assets in isolation. But even if O'Banion had a negative net worth at the time of sentencing, the sentencing judge could base his sentencing determination on O'Banion's future ability to earn. *See United States v. Matovsky*, 935 F.2d 719, 723 (5th Cir.1991); *United States v. Fabregat*, 902 F.2d 331, 334 n. 1 (5th Cir.1990).

12. The Supreme Court has held that the due process clause of the fifth amendment prohibits classifications that would be invalid under the fourteenth amendment's equal protection clause if practiced by a state. *See Johnson v. Robison*, 415 U.S. 361, 364 n. 4, 94 S.Ct. 1160, 1164 n. 4, 39 L.Ed.2d 389 (1974).

13. Two justices recently expressed a willingness to overrule *Solem* in the plurality opinion of *Harmelin v. Michigan*, — U.S. —, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." 463 U.S. at 292, 103 S.Ct. at 3011. Our role in reviewing a conviction under the eighth amendment is limited:

> Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits. In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.

*Solem,* 463 U.S. at 290 n. 16, 103 S.Ct. at 3009 n. 16. Moreover, the sentencing guidelines (enacted subsequent to *Solem*) are a "convincing objective indicator of proportionality." *Sullivan,* 895 F.2d at 1032.

█ Given our decision to reverse the ruling on the imprisonment portion of O'Banion's sentence, *see infra,* his proportionality claim is premature, except with respect to the fine portion of the sentence and his objection to the statute's classifying his conduct as a felony. In applying the *Solem* factors to the fine and felony conviction, we note that O'Banion raises no argument that his sentence is disproportionate compared to that received by other federal criminals or criminals in other jurisdictions. Rather, he argues only that the statute's felonization of his conduct is unrelated to the gravity of the offense.

We disagree. Regulation of currency imported into the United States is a serious matter; and Congress acted out of a legitimate concern for detecting persons, *inter alia,* who evade the drug and income tax laws.[14] And although this crime is less serious than some others that are classed as felonies, we cannot say that Congress'

decision to increase the penalties for failing to report currency from a misdemeanor to a felony violated the eighth amendment. Obviously, this case is readily distinguishable from *Solem,* in which the Supreme Court used the eighth amendment to invalidate a life sentence without parole imposed on a recidivist who uttered a $100 forged check. O'Banion has not raised a plausible argument that this statute is unconstitutional; nor has he overcome the presumption that Congress acted constitutionally in felonizing his conduct.

### 2.

O'Banion's next constitutional claim is based upon the substantive component of the fifth amendment due process clause. He asserts that "the failure to file a currency report concerning the transportation of 'clean' money has no substantial relationship to some matter of legitimate public concern". He likewise maintains that Congress was constitutionally required to utilize a less restrictive alternative, such as creating a rebuttable presumption that the funds in his possession were connected with criminal activity.

█ We quickly dispose of O'Banion's less restrictive alternative argument. O'Banion is asking that we engage in the policy debate behind the adoption of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311, *et seq.* It is not our role to do so. Needless to say, our role is to evaluate only whether Congress acted within the limits of the due process clause, not whether it could have accomplished its goal through other, less intrusive means.

█ O'Banion's contention that Congress exceeded the scope of its power to regulate conduct is likewise totally without merit. We have previously stated that "[d]ue to the subjectivity inherent in any inquiry by the judiciary in this area, the definition of the substantive content of the due process clause is a task to be under-

---

**14.** In *California Bankers Association v. Shultz,* 416 U.S. 21, 35, 94 S.Ct. 1494, 1504–05, 39 L.Ed.2d 812 (1974), the Court stated that "[t]he legislative history of the foreign-transaction reporting provisions indicates that the Congress was concerned with the circumvention of Unit-ed States regulatory, tax, and criminal laws which United States citizens and residents were accomplishing through the medium of secret foreign bank transactions." The Court was discussing 31 U.S.C. § 1101, the predecessor to § 5316.

taken with great caution". *Arnaud v. Odom*, 870 F.2d 304, 310 (5th Cir.), *cert. denied*, 493 U.S. 855, 110 S.Ct. 159, 107 L.Ed.2d 117 (1989). We cannot say that Congress acted arbitrarily; far from it. *See, e.g., Garcia v. United States*, 666 F.2d 960, 963 (5th Cir. Unit B), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982).

## III.

On cross-appeal, the government challenges imprisonment not being a part of O'Banion's sentence. It contends that the district court erred in departing downward from the sentencing guidelines based on (1) the lack of showing that the funds seized from O'Banion were criminally derived; and (2) a determination that O'Banion's conduct was not of a type that § 5316 was designed to redress. Because these arguments are meritorious, we reverse that portion of O'Banion's sentence and remand for resentencing on that issue.

The probation officer, based on an application of U.S.S.G. § 2S1.3(a)(1)(A), recommended that O'Banion receive a base offense level of 13. This recommendation assumed that O'Banion structured transactions to evade the reporting requirements. The probation officer recommended a two point reduction for acceptance of responsibility, resulting in a total offense level of 11. Because O'Banion had no past criminal convictions, the PSI assigned him a criminal history category of I.[15] Accordingly, O'Banion's guideline custody range under U.S.S.G. Ch. 5, Pt. A was 8 to 14 months. The probation officer recommended four months imprisonment, pursuant to U.S.S.G. § 5C1.1(d), which requires that at least one-half of a defendant's guideline range be satisfied by imprisonment, when imprisonment is imposed in conjunction with super-

vised release. In addition, the probation officer recommended three years of supervised release, with four months to be served as home detention.

As noted, we accept a district court's factual findings related to sentencing unless clearly erroneous. However, as also noted, we review *de novo* application of the guidelines. And, in a case where the district court departs from the guidelines, it must "offer reasons explaining why the departure is justified in terms of the policies underlying the sentencing guidelines." *Mejia–Orosco*, 867 F.2d at 221. *See also United States v. Sanchez*, 893 F.2d 679, 681 (5th Cir.1990).

At the sentencing hearing, the district court determined that it would depart downward for the following reasons:

> And the court is going to depart from the guidelines not because of everything that I have received by way of mail and opinion from people who have been formerly in law enforcement and the like, but because I am satisfied that in this particular case the offense from the matters that were before me do not necessarily go to the very heart of what is being addressed in this particular statute. I don't have any information to the effect that this was dirty money.

Further, it declined to reduce the offense level two points for acceptance of responsibility. Before departing downward, the district court began with an offense level of 13, assuming that the jury found that O'Banion "made false statements". U.S.S.G. § 2S1.3.[16]

■ The district court erred in departing downward from the guidelines based on the funds not being criminally derived. Guidelines § 2S1.3(b)(1) provides that "[i]f

---

**15.** The 1982 incident in which O'Banion was admonished for failure to report currency did not result in a criminal conviction.

**16.** Guidelines § 2S1.3 provides for an offense level of 13 if the defendant "structured transactions" or "made false statements" or "reasonably should have believed that the funds were criminally derived property". U.S.S.G. § 2S1.3(a)(1)(A)–(C). Otherwise, a defendant is assigned an offense level of 5 for failure to report monetary transactions. *Id.* at

§ 2S1.3(a)(2). O'Banion asserts that the district court improperly calculated the offense level at 13 rather than 5. Because we vacate a portion of O'Banion's sentence, this issue is moot. However, to assist the district court on resentencing, it may, among other things, want to determine whether O'Banion "structured transactions." *See United States v. Morales–Vasquez*, 919 F.2d 258, 265 (5th Cir.1990) (traveler who divided currency among himself and his companions in single incident "structured transactions" within meaning of U.S.S.G. § 2S1.3).

the defendant knew or believed that the funds were criminally derived property, *increase* [the sentence] *by 5 levels.*" (Emphasis added.) Therefore, the guidelines fix the base offense level on an assumption that the defendant did not know or believe that the funds were criminally derived. Accordingly, a downward departure from the base offense level for "clean money" is erroneous.

■ Secondly, the district court erred in departing downward based on a finding that defendant's actions did not "go to the very heart of what is being addressed in this particular statute." The court presumably relied on U.S.S.G. § 5K2.11, which provides in pertinent part:

> [C]onduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. For example, where a war veteran possessed a machine gun or a grenade as a trophy, or a school teacher possessed controlled substances for display in a drug education program, a reduced sentence might be warranted.

However, the purposes of the Currency and Foreign Transactions Reporting Act go beyond detecting monies derived from criminal activity and preventing money laundering. As the Eleventh Circuit stated in *United States v. One Lot of $24,900 in U.S. Currency*, 770 F.2d 1530, 1534 (11th Cir.1985), "[t]he purpose of the Act is to require reports of foreign transactions where such reports would be helpful in investigations of criminal, tax, and regulatory violations." Even money that was legitimately derived, but unreported, could be the subject of future income tax or regulatory evasion. Consequently, we conclude that O'Banion's failure to report was not beyond the scope of conduct Congress intended to address in the Act. Therefore, the district court's downward departure on this basis was also erroneous.

## IV.

For the foregoing reasons, we AFFIRM O'Banion's conviction and the fine and supervised release components (including home confinement) of his sentence; REVERSE the ruling on the imprisonment portion of the sentence; and REMAND for resentencing on that portion, consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.